FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 SEP 26 ᵖ 12: 10

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | § § § | |
| | § | CIVIL ACTION NO. 00-310 |
| **Plaintiff** | § | |
| | § | |
| v. | § | SECTION "B" |
| | § | |
| | § | |
| MOBIL OIL CORPORATION | § | MAGISTRATE 5 |
| | § | |
| **Defendant** | § | |

## SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

This supplemental memorandum is submitted by defendant Mobil Oil Corporation ("Mobil") to address various arguments made in plaintiff's opposition to that motion.

**I.    Plaintitiffs' argument that it is equivalent to the State of Louisiana for prescription purposes is contrary to the law set forth by the Louisiana Supreme Court as well as this Circuit.**

Plaintiff's argument that its claims can not prescribe is contrary to Louisiana law. The Louisiana Supreme Court specifically addressed whether a state agency can invoke the State of Louisiana's immunity from prescription in *State of Louisiana v. City of Pineville*, 403 So.2d 49 (la. 1981). *City of Pineville* held that a claim of the Louisiana Department of Highways was not immune

C:\DOCS\TPSB\MSJ-SUPP-MEMO

Fee
Process
X  Dktd
CtRmDep
Doc.No. 85

from prescription.  The Supreme Court held:

> The principle that the state is immune from claims of prescription has been explained as
> being **confined to actions brought by and in the name of the state itself**. (citations
> omitted) We subscribe to the following reasoning, advanced in the cases above: the "State,"
> for purposes of the constitutional immunity from prescription, does not include a state agency
> which is a body corporate with the power to sue and be sued and which, when vested with
> a cause of action, is the sole party capable of asserting it.  Regardless of its status as an
> instrumentality of the state, such an agency remains a distinct legal entity subject to claims
> of prescription except where the law provides otherwise.

In this case, the School Board filed suit in its own name, not on behalf of the State of Louisiana.  It

is the real party in interest because it seeks to recover damages as a result of a breach of a lease

executed in its own name. La. R.S. 30:152.  Any money which may be awarded in this action would

be payable to plaintiff, not the State.  La. R.S. 30:154; La. R.S. 41:718.  Courts have previously

recognized that, given their local powers of taxation and other characteristics, a parish school board

should not be considered the State. *See discussion Minton v. St. Bernard Parish School Board*, 803

F.2d 129, 131-132 (5th Cir. 1989)..  Furthermore, the school board is specifically authorized to lease

Section 16 lands for development and production of minerals and proceeds from such leases are paid

into the fund of the local school board for general school board purposes.  La. R.S. 30:152.A; La.

R. S. 41:718; La. R.S. 30:154; La. R.S 30:148.1- 148.2; La. R. S. 30:148.7 and La. R.S. 17:59.  As

a result, the School Board is not entitled to invoke the State's immunity from prescription.[1]

Finally, the law of this Circuit confirms that the School Board is not entitled to assert the

---

[1]        Plaintiff erroneously relies upon *State v F. B. Williams Cypress Company.*, 131
La. 62, 58 So. 1033 (1912).  This case involved a claim by the State of Louisiana, not a school
board.  The other case city by plaintiff, *Liner v. Terrebonne Parish School Board*, addressed
acquisitive prescription, not a claim for damages to Section 16 property..

State of Louisiana's immunity from prescription.   The Fifth Circuit has consistently and routinely rejected parish school boards' attempts to characterize themselves as agents of the State.   School boards are not arms of the State of Louisiana for purposes of 11th Amendment immunity from suit. *Minton*, 803 F.2d at 131-132; *Moore v. Tangipahoa Parish School Board,* 594 F.2d 489, 493-494 (5th Cir. 1989); *Mt. Healthy City School District v. Doyle*. 49 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (local school board much more like county or city than like arm of state and not entitled to assert 11th Amendment immunity).   In addition, a school board is considered a citizen separate from the state itself for purposes of diversity-based federal jurisdiction.   *Morgan Dallas Corp. v. Orleans Parish School Board*, 302 F. Supp. 1208, 1209 (E.D. La. 1969); *Terrebonne Parish School Board v. Mobil Oil Corporation*, 1989 WL _140217  (E.D. La.); *School Board of St. Charles Parish v. Roxco, Ltd.*, 2001 WL 283094 *1 (E.D. La.).   Accordingly, federal law also establishes that the plaintiff is not entitled to be treated as the State.

## II.    Plaintiff's argument that Mobil is obligated under the Louisiana Mineral Code to fill in the canal is unsupported by the law and evidence

The School Board's argument that Mobil is obligated to fill in the canal under Mineral Code articles pertaining to mineral leases is defective in several respects.

First, the Mineral Code was not in effect when the canal at issue was dredged in 1959.  The Louisiana Mineral Code was adopted in 1974. La. Acts 1974, No. 50 (effective January 1, 1975). Louisiana statutes apply prospectively only, unless specifically made retroactive by the legislature. La. C.C. Art. 6 (West 2001); La. R.S. § 1:2.  The Mineral Code was not made retroactive; to the contrary, it was made effective on January 1, 1975.  La. Acts 1974, No. 50, Section 6 (" All

provisions of this Act shall become effective on January 1, 1975."). As a result, the Louisiana Mineral Code articles cited by plaintiffs are not controlling in this case.

In any event, the Louisiana Mineral Code does not address Mobil's liability to the School Board under a farmout agreement. The Mineral Code makes no specific references to farmout agreements and a farmout agreement determines the rights of the parties independent of the Code unless it violates some express codal prohibition. J. McCollam "A Primer for Practice of Mineral Law under the State of Louisiana Mineral Code," 50 Tul. L.R. 729, 861 (1976). Furthermore, the law that controls Mobil's liability (which was cited in Mobil's original memorandum and ignored in the School Board's opposition) is clear that no privity of contract arises between a mineral lessor (the School Board) and a party who obtains a farmout (Mobil) until the obligations of the farmout are fully performed and the assignment of the lessee's interest is actually executed. *See Robinson v. North American Royalties,* 509 So.2d 679, 681 (La. App, 3rd Cir. 1987) (citation omitted). Because the School Board has not, and can not, offer legal authority or evidence for its proposition that Mobil was ever an assignee of Southern Natural's lease, it has no basis for its breach of contract claims against Mobil.

## III.    Plaintiff's view of the undisputed evidence supporting Mobil's motion is contrary to Louisiana's law of prescription.

Plaintiff goes to great lengths to argue that its own records establishing its longstanding knowledge of erosion related to oilfield activities on Section 16 lands are insufficient to commence prescription. However, the plaintiff's feigned ignorance provides no basis for preventing the accrual of prescription. Prescription commences when a reasonable person exercising reasonable diligence

would have been aware of possible damage to his property. The undisputed evidence shows plaintiff was specifically told years before this lawsuit that it had potential claims for oilfield-related damage to Section 16 properties. [See Mobil's original memorandum at pp. 11-12]. In addition, plaintiff's expert Charles Camp recently testified that he and the School Board's current counsel, Michael St. Martin, met with the Terrebonne Parish School Board in 1997 to discuss filing lawsuits against persons who had engaged in oilfield activities in Section 16 lands throughout Terrebonne Parish. [See excerpt from deposition of Charles Camp, pp. 7-11 (attached as Ex. 1)]. Camp admitted that Mr. St. Martin told the School Board that the oil industry had damaged the property. [*Id.* at p. 11]. As this lawsuit was not filed until 1999, the undisputed evidence shows plaintiff's claims are prescribed, notwithstanding its contrary arguments.

**IV.    Plaintiff has failed to carry its burden in opposing defendant's motion.**

The plaintiff has not offered any evidence in its opposition to Mobil's summary judgment motion.    In addition, the plaintiff did not submit a statement of material facts as to which there exists a genuine issue to be tried as required by L.R. 56.2B and, as a result, the statement of uncontested facts submitted by Mobil are deemed admitted. Instead, plaintiff relies upon self-serving assertions and characterizations of its own records in opposition to Mobil's motion. It is axiomatic that a properly supported summary judgment motion cannot be opposed simply by a party's reliance on its allegations, pleadings, unsubstantiated assertions, hearsay or speculation. *Fowler v. Smith*, 68 F. 3d 124, 126 (5th Cir. 1995); Fed. R.C. P. 56(e). Under the circumstances, Mobil's motion is not properly opposed with legitimate evidence.

## CONCLUSION

Mobil's motion for summary judgment should be granted.  The plaintiff's opposition relies upon legal arguments and characterizations which are contrary to a proper application of the law and the evidence obtained from the plaintiff and its records.

Respectfully submitted,

**FRILOT, PARTRIDGE, KOHNKE
& CLEMENTS, INC.**

**ROBERT B. McNEAL (Bar No. 14211)
MILES P. CLEMENTS (Bar No. 4184)
SHERI S. FAUST (Bar No. 26283)**
3600 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3600
Telephone: (504) 599-8014
Facsimile : (504) 599-8114

**Counsel for defendant Mobil Oil Corporation**

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing pleading has been served upon counsel of record fo all parties by facsimile transmission, hand delivery, by delivery service, delivery charges prepaid and properly addressed, or by U.S. Mail, postage prepaid and properly addressed, this _25_ day of ___September___, 2001.

COMPLIMENTARY

## In The Matter Of:

*TERREBONNE PARISH SCHOOL BOARD   v.*
*MOBIL OIL CORPORATION*

---

*CHARLES M. CAMP*
*September 7, 2001*

---

*HUFFMAN & ROBINSON, INC.*
*Certified Court Reporters*
*One Shell Square, Suite 250 Annex*
*701 Poydras Street*
*New Orleans, LA  USA  70139-6001*
*(504) 525-1753    FAX: (504) 525-1761*

*Original File CC090701.I1, 100 Pages*
*Min-U-Script® File ID: 1161540850*

## Word Index included with this Min-U-Script®

EXHIBIT

1

Page 1

[1]     UNITED STATES DISTRICT COURT

[2]     EASTERN DISTRICT OF LOUISIANA

[3]

[4] TERREBONNE PARISH        CIVIL ACTION

    SCHOOL BOARD

[5]

    VERSUS          NO. 00 CV 0310

[6]

    MOBIL OIL CORPORATION

[7]

[8]

[9] Deposition of CHARLES M. CAMP, 205 Raywood

    Drive, Houma, Louisiana  70360, taken in the

[10] offices of St. Martin & Williams, 4084 Highway

    311, Houma, Louisiana  70361-2017, on Friday,

[11] the 7th day of September, 2001, beginning at

    8:35 a.m.

[12]

[13]

    APPEARANCES:

[14]

    ST. MARTIN & WILLIAMS

[15] (BY: JOSEPH G. JEVIC, III)

    4084 Highway 311

[16] Post Office Box 2017

    Houma, Louisiana  70361-2017

[17]

        ATTORNEYS FOR THE PLAINTIFF

[18]

[19] FRILOT, PARTRIDGE, KOHNKE & CLEMENTS

    (BY: ROBERT B. McNEAL)

[20] Suite 3600

    1100 Poydras Street

[21] New Orleans, Louisiana  70163-3600

[22]     ATTORNEYS FOR THE DEFENDANT

[23]

    REPORTED BY:

[24]

    CAROL E. VALLETTE, CCR,

[25] Registered Professional Reporter

Page 2

[1]         INDEX

[2] EXAMINATION BY:          PAGE

[3] MR. McNEAL.............................. 4

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11] EXHIBITS:          PAGE

[12] Exhibit Number 1............................ 5

    Document entitled "Notice of

[13] Deposition"

[14] Exhibit Number 2............................ 5

    Document entitled "Subpoena in a

[15] Civil Case"

[16] Exhibit Number 3............................ 12

    Resume' of Charles M. Camp

[17]

    Exhibit Number 4............................ 19

[18] July 9, 2001, letter from Charles

    M. Camp to Michael X. St. Martin,

[19] with attachments

[20] Exhibit Number 5............................ 75

    Surveyor's field notes

[21]

    Exhibit Number 6............................ 75

[22] Surveyor's field notes

[23]

[24]

[25]

Page 3

[1]     STIPULATION

[2]

[3]     IT IS STIPULATED AND AGREED by and

[4] between counsel for the parties hereto that

[5] the deposition of the aforementioned witness

[6] is hereby being taken under the Federal Rules

[7] of Civil Procedure, for all purposes, in

[8] accordance with law;

[9]     That the formalities of reading and

[10] signing are specifically not waived;

[11]     That the formalities of sealing,

[12] certification and filing are specifically

[13] waived;

[14]     That all objections, save those as to

[15] the form of the question and the

[16] responsiveness of the answer, are hereby

[17] reserved until such time as this deposition,

[18] or any part thereof, may be used or sought to

[19] be used in evidence.

[20]

[21]

[22]     CAROL E. VALLETTE, CCR, Registered

[23] Professional Reporter, in and for the Parish

[24] of Orleans, State of Louisiana, officiated in

[25] administering the oath to the witness.

CHARLES M. CAMP
September 7, 2001 2:00-cv-00310-RL
Document 85
Filed 09/26/2001 Page 9 of 10
TERREBONNE PARISH SCHOOL BOARD · v.
MOBIL OIL CORPORATION

Page 4

[1] CHARLES M. CAMP,
[2] after being first duly sworn in the cause by
[3] the court reporter, testified as follows:
[4]         EXAMINATION BY MR. McNEAL:
[5]     Q: Mr. Camp, my name's Rob McNeal.
[6] We've met before.
[7]     A: Yeah.
[8]     Q: I'm here today representing the
[9] defendant in a lawsuit brought by the
[10] Terrebonne Parish School Board. My client's
[11] Mobil Oil Corporation. I'm going to ask you
[12] questions because, as you know, you prepared
[13] an expert report in this case and I want to
[14] get some information about that.
[15]     A: Correct.
[16]     Q: I know you've given depositions
[17] before, but just for purposes of the record,
[18] will you agree that in the event you don't
[19] understand my question or don't hear me or
[20] need a clarification, that you'll let me know
[21] so that we can be sure to get an accurate
[22] answer from you?
[23]     A: Yes, sir.
[24]     Q: Why don't we go ahead and move
[25] forward. First of all, I'm going to attach as

Page 5

[1] Exhibits 1 and 2 to the deposition the Notice
[2] of Deposition along with a copy of a subpoena.
[3] First, I'd like to go through the subpoena and
[4] ask what, if any, documents or material you
[5] have that are responsive to the document
[6] request.
[7]     (Whereupon, Exhibit Number 1
[8] and Exhibit Number 2 were marked for
[9] identification.)
[10]     A: You want me to read it out loud,
[11] or does the document speak for itself?
[12]         EXAMINATION BY MR. McNEAL:
[13]     Q: I will read each one to you. You
[14] can tell me if you have anything.
[15]     A: That's fine.
[16]     Q: Item Number 1 on Exhibit 2 is
[17] "Any contract between deponent and the
[18] Terrebonne Parish School Board entered into
[19] during the past five years."
[20]     A: No.
[21]     Q: Do you have a contract for the
[22] work that you performed in this case with
[23] anybody else?
[24]     A: No.
[25]     Q: Under what terms and conditions

Page 6

[1] are you providing your services in this case?
[2]     A: Hourly basis.
[3]     Q: And who is paying you for your
[4] work?
[5]     A: The St. Martin firm.
[6]     Q: How much are you paid an hour?
[7]     A: $60 an hour for regular work, $90
[8] for deposition and appearance in court, plus,
[9] obviously, expenses and automobile.
[10]     Q: I know you've been working on
[11] these Terrebonne Parish School Board cases for
[12] some time. Can you tell me approximately when
[13] you began working on them?
[14]         THE WITNESS:
[15]     '97, I believe, huh, Joe?
[16] When did it start?
[17]     A: I been since the — I went with
[18] Mike to the School Board meeting when we got
[19] the contract in case there was questions that
[20] he couldn't answer that I needed to answer.
[21] So, I've been — since the beginning of the —
[22] Mike — since beginning when the St. Martin
[23] law firm has been working, I have been
[24] working.
[25]     Q: Okay. How did this relationship

Page 7

[1] between you and the St. Martin firm develop in
[2] connection with these cases?
[3]     A: Mike called him up and asked me
[4] would I work with him on it. I told him yes.
[5]     Q: Do you recall when that occurred?
[6]     A: Again, best of my recollection,
[7] sometime in '97.
[8]     Q: At that time, were you and Mr.
[9] St. Martin — you had a meeting with the
[10] School Board?
[11]     A: Yes, sir.
[12]     Q: And what did you tell — what
[13] happened during that meeting?
[14]     A: Not much. Mike got up and made a
[15] little presentation to them. As it turned
[16] out, I didn't say anything, and they accepted
[17] his proposal.
[18]     Q: It was a presentation regarding
[19] what?
[20]     A: You know, the School Board had a
[21] bunch of property and the property had been
[22] damaged, and I don't remember what all he
[23] said. He talked, probably, for 15 minutes or
[24] so and, you know, that he would represent the
[25] School Board if they would, you know, sign a

Page 8

[1] contract with him, which they voted to do.
[2]    Q: Did he advise the School Board
[3] that the lands he was referring to were
[4] Section 16 tracts?
[5]    A: Yes, I'm sure.
[6]    Q: Did he advise them that the
[7] problems here were erosion and other problems
[8] on the property as a result of erosion and oil
[9] and gas canals?
[10]    A: The best I can remember, yes, but
[11] I'm not positive.
[12]    Q: Do you recall there being a
[13] discussion about what were the damages or
[14] conditions on the property that were described
[15] to the School Board?
[16]    A: I'm not sure I understand the
[17] question.
[18]    Q: Do you recall what other
[19] conditions, if any, Mr. St. Martin described
[20] on the property that — during that meeting?
[21]    A: Not really. Just that there had
[22] been damage by the oil industry to the
[23] property. This was, like, at 12:00 at night.
[24] I wasn't really paying a hell of a lot of
[25] attention.

Page 9

[1]    Q: All right. That's fine. Can you
[2] give me an estimate of how much you've been
[3] paid for work you've done on Terrebonne Parish
[4] School Board cases since you began working on
[5] them?
[6]    A: Not really. It's several
[7] thousand dollars. I have no idea how many —
[8] if it's that important, I could possibly get
[9] the figure for you, but 10,000 maybe. I don't
[10] know. That's a good guess. I don't know.
[11]    Q: In terms of your income since
[12] 1997, what percentage of it would be
[13] represented by payments you've received for
[14] work that you've done for the St. Martin law
[15] firm overall?
[16]    A: Overall? Well, let me ask you to
[17] clarify that a little bit. Okay? And the
[18] reason that I say that is that I'm involved
[19] with Mandalay Oil & Gas, which — do you know
[20] what Mandalay Oil & Gas is?
[21]    Q: Isn't that a company owned by Mr.
[22] St. Martin?
[23]    A: Yes, and others, and I do a lot
[24] of work for Mandalay Oil & Gas. Do you
[25] consider that St. Martin or do you consider

Page 10

[1] that Mandalay Oil & Gas?
[2]    MR. JEVIC:
[3]    He said the St. Martin firm;
[4] that's not the St. Martin firm.
[5]    THE WITNESS:
[6]    That's what I want to be clear
[7] about.
[8]    EXAMINATION BY MR. McNEAL:
[9]    Q: Sure.
[10]    A: I don't know. The most work that
[11] I have done for the St. Martin firm — well,
[12] when — well, the only work, when you say St.
[13] Martin firm, would be the Terrebonne Parish
[14] School Board that I can remember offhand. I
[15] do things for Mike personally, I do things for
[16] Mandalay Oil & Gas, but for the firm of St.
[17] Martin & Williams, probably the School Board
[18] is the only thing I can think about right now
[19] that I know about.
[20]    Q: You guesstimate that's
[21] approximately $10,000?
[22]    A: Yeah.
[23]    Q: Let me make my question a bit
[24] broader. What percentage of your income do
[25] you derive from work that you do for Mr. St.

Page 11

[1] Martin or businesses that he's involved in?
[2]    A: Man, that would be hard to say.
[3]    Q: Eighty percent?
[4]    A: Somewhere in that range,
[5] probably, yes.
[6]    Q: How long has that been the case,
[7] for how many years?
[8]    A: Oh, since — I retired from T.
[9] Baker Smith in 1994, and then I —
[10]    Q: If it will help you, I will
[11] attach as Exhibit 3 a copy of your CV, and
[12] it'll tell you the dates when you retired.
[13]    A: Yeah, right. I know I retired in
[14] '94. I'm just trying to think. I think it
[15] was about 1997, because when I — in '95, I
[16] didn't do a whole lot, and in '96 and '97, I
[17] worked on a big case over in Lafayette in the
[18] Scott Field. So, I would think that there
[19] might have been some minor stuff that I did
[20] for Mr. St. Martin during '95, '96 and '97,
[21] but when I think, when we started working on
[22] the Terrebonne Parish School Board was when I
[23] started working for him.
[24]    Q: That would be approximately 1998?
[25]    A: Something like that.